I begin our day with argument in the case of Swiss Reinsurance v. Airport Industrial Park, Inconel. Good morning. May it please the Court. I am Ted Baum of the law firm of Ernst & Droste LLP. I represent the appellant, Swiss Reinsurance America Corporation. May I reserve two minutes of my time for rebuttal. Can I just ask you just as a background question at the outset, was there any indemnity agreement between you, your client, and Amwest under the reinsurance contract? There was the indemnity, no, the indemnity ran from. In other words, you provided reinsurance. Correct. For 2-6 or up to 2-6 as I recall. Correct. To Amwest. Was there an indemnity, was there something equivalent to an indemnity agreement between you and Amwest? Yes, there would be an agreement that the reinsurer, that the primary obligation of the bond up to a certain amount would be the responsibility of the direct writing company, Amwest. Did you make a claim against them with respect to their Nebraska insolvency proceeding? There were claims back and forth. There was a global claim back and forth between Amwest and Swiss Re with respect to multiple claims. In other words, for a certain portion of bonds. So you made a claim? Yes, there would have been claims made. And then did you get any recovery? There was ultimately a payment made by Swiss Re to Amwest in the liquidation proceeding. Payment made from Swiss Re to Amwest? Right, because, I'm sorry, go ahead. Amwest to Swiss Re you mean? No, actually it's the other way around because the reinsurance kicks in at a certain level so that. I thought you paid the money to finish the performance bond to finish the project which is a million four. Correct. But I'm with respect to your reinsurance contract with Amwest, you made a claim against them and you said there was some type of settlement. Did you get any recovery from that settlement? Not with respect to the payments made in this, with respect to this project because what happens was there was, this is part of a very complex relationship. There are bonds all over the place, yeah, offsets and back and forth. And ultimately there was a settlement in the liquidation, but there wasn't a recovery with respect to the amounts paid on this project because of the reinsurance. So you're telling us that you have no recovery against Amwest with respect to the reinsurance arrangements that you had with them on this project? On this project, correct, because this was, because of the reinsurance cut through that was in place on this particular job, there was a direct right of claim by the government. So Swiss Re became responsible for a piece of the action, if you will, that it would normally not have been responsible for. Wouldn't you have some sort of a claim against, maybe I'm going over the same territory, but even if the government had a direct claim against you in the position of reinsurer, wouldn't you have had at least some adversary action opportunity or something like that against Amwest in the bankruptcy context? Let me answer that in two ways. Let me ask you the question this way. Do you contend that the insolvency of Amwest had nothing to do with your responsibility to step in and take over in this, in the compliance completion of the project? That's correct. And the reason I answer it that way, Your Honor, is because the reinsurance, in this particular case, there was a reinsurance cut through which gave the government a direct right of action against the reinsurer so that the insolvency... But if they hadn't been insolvent, wouldn't the government have been looking to Amwest? I see what you're saying. Yes, Your Honor. But for the insolvency... You wouldn't have been on the, they wouldn't have been looking to cut through anything because they'd have had somebody standing in front of them, Amwest, right? That's correct. But that wasn't a defense to your obligation. You had, they had a direct, you had a direct obligation to them. Exactly. This was precisely the set of circumstances that invoked our liability. Now under the agreement, under the GIA, you argue intended beneficiary in your brief, but under the GIA, you were included in the word surety. Correct. It just seems to me that it's not really a third-party beneficiary situation, because you're, you're in the contract as being a specific beneficiary by definition, almost as if you have a, you know, something that's binding on heirs and assigns, you don't, if someone dies, you don't call the heir a third-party beneficiary. They're absolutely a named beneficiary, weren't you? I mean, wasn't there an independent obligation under the GIA to your client? I believe that's correct, Your Honor. The reason we argue the third-party beneficiary is because, although I agree, we are, Swiss Re as a reinsurer is directly included in the definition of surety and therefore has the rights under the indemnity agreement. The reason we raise a third-party beneficiary argument is in, as an alternative because of the fact that Swiss Re, the name Swiss Reinsurance America doesn't appear anywhere in the face of the document, although it certainly is included within the definition. But you're relying on the definition of surety. Correct. Under the agreement between PEC and, and Amwist. Correct. Just as a matter of custom, wouldn't you yourself go get an independent indemnification agreement, or do you, do you get proof of the existence of this before you sign off on reinsurance? I mean, it seems like, you know, you're hanging your hat on something that Amwist did and say, oh yes, we're covered. Just as a matter of practice, do you require this before you sign on to reinsurance, or do you have your own separate indemnity agreement? There's, there typically is not a separate indemnity agreement with, directly with the was here, the, the reinsurance companies typically rely on the underwriting practices of the, what's called the direct writing company here at Amwist to obtain those kinds of protections. I mean, that's not in the record. It might be helpful that it is in the record as to the, the course of dealing in the insurance industry as to routinely reinsurers, you know, that the Amwists of the world have something like this. You're, you're right. It would have been helpful to have in the record. It is routine, as I understand it, that in, in the reinsurance, again, they're relying on under, there's underwriting practices. The direct writing companies are the ones who are providing the underwriting to determine the creditworthiness of bond principles and obtaining protections such as the indemnity agreement. I mean, just to pick up on that, which I think is a very good point. What is the industry practice as to how the Amwist and its reinsurers would perceive this? Would this be perceived as a, just one bond or is it perceived as a project? It is, or is there no industry practice on that? It is perceived, they're perceived as independent obligations, but they're obviously linked because they are related to the same project, but they are without question separate and independent obligations. The bonds, for example, the payment bond benefits subcontractors and suppliers, not the government. Obviously the performance bond benefits the government in this particular situation. So they're very different obligations with different rules with respect to enforcement, with different obligations, different exposures to risk. Yeah, I assume with regard to the payment bond, it's the typical, what, 90% you pay every month to the subs, and then if you don't pay that or the remaining 10%, then that particular payment bond kicks in. Is that what happens? When you look at your requisition. Your Honor, what you're referring to is typically there's a 90% payment and a 10% retention on a monthly basis paid by the government to the contractor. And then, yes, typically a lot of that is then due to various subcontractors and suppliers. It may not be the entire thing. Were you asked to give a payment bond here? Amwist was asked to give a payment bond. I'm reinsured for a payment bond, I apologize. You didn't need to. Correct. And the reason it wasn't required, under, let me back up if I may, statutorily these bonds are required under the Miller Act. At the time these bonds were written, the Miller Act only required a 40% payment bond and a 100% performance bond. So you had a disparity in amounts. And that's why Swiss Re reinsured only the performance bond, because it was over Amwist's treasury limit. Would you agree that Pennsylvania law is pretty clear that indemnities are construed in a way that is typically against the party seeking indemnification? That is, if you're the party looking to be indemnified where there's doubt, it's going to cut against you rather than for you. Do you agree or disagree with that? What I, I would disagree in the sense that the indemnity agreements such as this one are not new to the courts of Pennsylvania. And they have routinely enforced this kind of indemnity. Is there a, you cited a case, the Ratty versus Wheelan-Pittsburgh case that talks about a peri-rousie rule. I'm not sure if I'm saying that, that rousie correctly, but that, that case talks about this peri-rousie rule, which seems to say that you, somebody seeking indemnification, if there, if the indemnification would be such that it would release it or help it from negligence or its own default, the indemnity has to be crystal clear for that kind of indemnity to hold water, right? Correct. Okay. If that's the rule and you're trying to take advantage of the circumstance that, that is, be a beneficiary of, of A.M. West's indemnification, do you bear the brunt of the peri-rousie rule and have to show that the indemnification was crystal clear in, in going, in being intended to indemnify A.M. West and Swiss Re, even if part of the reason the project didn't get finished was because A.M. West defaulted and disappeared? I'd like to address that last point in a moment, if I may, Your Honor. But with respect to your main question, I also prefer not to think of us as taking advantage of anyone. We're dealing with what we believe to be an unambiguous indemnity agreement. And, and those kinds of agreements have been routinely enforced by the courts of Pennsylvania where there has never been a suggestion in this case that there was any ambiguity in the language. In fact, even the trial court agrees that the language is unambiguous. Okay. Well, first let me hasten to say, by using the words taking advantage, I don't mean that in a pejorative sense. I mean, there's an indemnity agreement and your position clearly is we're third-party beneficiaries of that. We get to take advantage. In other words, we have the benefit of that, right? That's, that's, that's clear. Correct. So, if I understood the Perry-Rousey rule, and perhaps I didn't, that's why I'm looking for some guidance here. Didn't you, isn't it the case that it's not enough that, oh, I can read and understand this, but that, in other words, not typical lack of ambiguity, but there has to be something specific and precise and unequivocal that says, you know, I'm indemnifying you even if the reason for the loss that we're all dealing with is you, that your fault is something I'll still indemnify you for. Is that the character of that rule, or am I understanding it incorrectly? I think that's the, may I answer? I see I'm out of time. Yeah, please do. I have another question for you. The, I think you have the rule correctly, but the issue here was not whether there was some fault with respect to the performance bond. The issue is whether there was an unambiguous obligation to indemnify for the performance bond losses as a result of a default as defined by that agreement. There was a default as defined by that agreement. The contractor was terminated by the government. How do we know how to attribute that fault? I mean, some piece of it, do you think that there's no piece of this problem that was caused by AmWest evaporating? I mean, I understand the position Swiss Re has is that the PEC for the defendants here, they fouled up the project. They lost this project because they did a bad job. I understand that position, but there's another position being pressed on us, and it seems to have some merit, I think at least superficially, that maybe the fact that AmWest went belly up had something to do with the fact that you ended up paying money on the project. Are you saying that had nothing to do with it? Because if it had something to do with it, how do we figure out who bears what percentage of fault here? Or would we say to the district court, you've got to figure that out? Well, I would say with respect to damages, certainly there would be a requirement to remand. This is a determination of liability only. But with respect to AmWest, I understand AmWest didn't incur a loss in this project because no claim was made on the performance bond until after AmWest was in liquidation, which is why the government turned directly to Swiss Re. But to answer your question, no, I don't think that AmWest's insolvency led to. I understand that's been argued here vociferously by the respondents. And it's what the district court found, right? Well, the district court did find that, Your Honor, but the district court also completely ignored not one but two affidavits from the government. The people who were making the decision who said, that's not why we did it. That was a factor, and that was something we listed. And in fact, the court claims latched onto that. Why? Because it's easy. It's uncomplicated. But the government employees who were responsible for making that determination, they said, that's not why we did it. We did it because they were 50 percent done with the job after 18 months, and they had 18 days left. They weren't going to get it done. Can I ask a question? The GIA and the district court's construction of it, I read it differently from the district court. It acts like there's a lot of benefit flowing to PEC, whereas if you read the GIA, it is clearly for the benefit of the surety. Correct. And in fact, there are no default provisions in it. There's nothing saying performance under the bonds is a condition. It's amazingly lacking in any provision that would fit this situation. It does require the execution and delivery of bonds. That is the sum total of the obligation under the indemnity agreement. The AMWES has to execute and deliver the bonds. And my question to you is whether that was they lived up to that or whether delivery, and I'm going to ask your colleague also, whether delivery means substitution in the event of a problem as well. Because there's nothing in there saying they have to pay on the bonds. And one way of looking at this would be that once they have executed and delivered the bonds. They've performed. They have performed under the indemnity. Now, granted, the bonds themselves may say, oh, and by the way, you know, if you don't do this. But the indemnity itself doesn't say, and oh, by the way, you have to perform under the bonds. Again, maybe I'm talking mixture of industry practice, but no one's really talked about the fact, and you haven't really asserted the fact that they did fulfill the obligation under the GIA. I've come up with this all on my own. Maybe it's not accurate. Well, no, I think you've latched onto something that for someone like me is sort of patently obvious because of the kinds of work that I do. But you're right, Your Honor. The bonds were delivered, in particular the performance bond was delivered, and nobody, not the government, not the defendants, appellants, nobody has ever said Swiss Re didn't do anything wrong here. And so if the GIA runs to Swiss Re independent of or as an additional named surety, if you will, but for the fact that its name wasn't in there but a reinsurer, then you would be home free if that's the way the GIA is construed. Correct. And remember that we're only asking for the performance bond. Oh, yeah, of course. Nothing, but as the performance, there was no interruption with respect to the performance bond. It flowed. Just to pick up on that, if the obligation is to deliver bonds. Payment and performance. And that's basically the sole obligation. And one of those. Is disappears payment bond. If you look at this on a project-by-project basis, then there's got to be a default by M-West, isn't there? If you look at it on a bond-by-bond basis, I understand where you are. You just separate out the payment bond from the performance bond, and I'm only dealing with the performance bond here. But if you deal with it on a project-by-project basis, don't you have at least a partial performance problem? There is an issue that would potentially have to be dealt with by the principal here, which is find a replacement payment bond potentially. And it didn't. And it did not. And in fact, Your Honor, it did not attempt to. Well, there's a possible argument it couldn't get one because it was in dire straits itself. There's nothing in the record that suggests there was even an attempt to find a replacement bond. But my question is, is this regardless of what they did or didn't do, if this is a project by – if you look at this on a project basis, this GIA, then you picked up part of what they messed up with, but you didn't pick up because you didn't have to the payment bond portion. Correct. And if you're in the shoes of the surety, because you're defined as a surety, then what the district court is saying, they defaulted. Sorry, but there's nothing you can do to get your money back from PEC under the GIA. Perhaps another day, another place, another forum, you can get it back from AmWest. But the fact remains, Your Honor, that there were independent reasons for the default beyond simply the lack of the payment bond. And as you point out, Swiss Re didn't take on the obligation of payment bonds. Swiss Re did what it was supposed to do. So what are you asking us to do? Do you want us to remand? Yes, I'm asking for a reversal of the district court's denial of our motion for summary judgment, grant liability, and remand for determination of damages. What we had agreed to do as a procedural matter below was simply submit the issue of liability, get that resolved, and then move on to the damages. All right. Okay. We'll hear from you on rebuttal. Thank you. Thank you, Your Honor. Thank you for your extra time. Morning. Morning. May it please the Court, my name is Richard Victoria from Meyer, Unkavik & Scott in Pittsburgh, and I'm here on behalf of the Appalese Airport Industrial Park doing business as PEC, Pesh, Inc., Paul Chambers, and Nancy DeFazio, also known as Nancy Chambers. Please forgive my voice today. I've been fighting a cold for two weeks, and I'm going to try to do my best to keep 15 minutes of voice for you. The question here, then, is you've got a government employee, Jerry Brewer, an engineer at the Corps' Pittsburgh office that said, hey, look, the bonds were not the big issue here as to why we terminated. We could have worked that out because we were getting, you know, close to the finish here. They just didn't do the job. Well, Your Honor, there is testimony in the record from Mr. Chambers that disagrees with that. It's unfortunately not pointed out in the briefs filed with the Court. I can direct the Court to those cases. This one person is saying we could have worked that out. From a policy perspective, why should you be able to benefit from your own screw-up with regard to your obligation to Swiss Re? In other words, the government said you didn't perform. You performed inadequately with regard to this particular project. You were put on notice, and the consequences of ruling in your favor would appear to be that we say, okay, you can mess up big time, but too bad to Swiss Re. Your Honor, I don't believe that those are the consequences of a ruling in our favor. Well, I'm talking about you're, in effect, asking us for a ruling in a case that goes down to the future and says, okay, Yes, we didn't perform, but if there's some other reason that we can say that there was a problem with AmWest, or in this case the insurer, we're home free. There's no claim against us. I don't, first of all, this makes a presumption that there's a finding that the reason for the default was. You have to assume that. I'm not saying you have to concede that. And I am assuming that for the sake of the argument. Yes, Your Honor. Your Honor, I don't think that that is the situation here, factually, but that's not before the court right now. Just make the assumption. And I don't think that that's the precedent that this decision would set. I think it does exactly the opposite. It says what it would do if you ruled in favor of the appellant is allow AmWest and Swiss Re. to benefit from their default, or AmWest default under the agreement. Swiss Re. didn't default. They performed. They performed. They put a million for us. Under the indemnity agreement, it says they're a surety and you will indemnify them. And you didn't put any provision in any contract that said, oh, by the way, we're not going to indemnify a Swiss Re. insurer if someone else who has been a surety defaults under a bond that has been delivered. Where is that provision inserted as an excuse to your performance vis-à-vis Swiss Re. under the GIA? Admittedly, Your Honor, that provision is not in the agreement. What is in the GIA that would be an out for you in terms of indemnity? A statement of what the consideration for the agreement is. Is the execution and delivery of bonds. And that happened. Right? I don't believe execution and delivery. I believe that execution and delivery implies that they carry through on the obligation to keep the bonds in place. Well, once they execute and deliver, the obligations then are replaced by the terms of the bonds themselves. And the bonds themselves said, oh, and by the way, if you fail to perform here under, you know, we obviously don't have to perform under the GIA. But I guess that isn't there. Well, even the GIA. Doesn't the GIA itself say that AMWES has the power in its discretion to pull a bond at any time, to take a bond away? I believe it does, Your Honor. So if AMWES has the unfettered discretion to after, as Judge Rendell says, executing and delivering a bond, if it within the terms of the GIA can say a day later, all right, give it back, or we're not honoring it. We're pulling the bond. And that's contemplated, specifically contemplated by the GIA. How can it be a failure of consideration if years later the bond evaporates? There's no – the fact of the matter is, Your Honor, there's no consideration for the promises in the agreement. What is provided to – But the consideration was the giving of the bond to begin with, which under the agreement can be pulled the next day. Well, doesn't the contract itself – I know it doesn't say it, but isn't the implication that if you can pull the bond the indemnification obligation ends because there is no longer consideration for that promise? It doesn't say that. The only default here is the possibility of your default. There's no default provision as to – You might have a stronger argument if your client hadn't agreed in the GIA that AMWES had the authority on its own to pull the bond whenever it wanted to. I mean, I'm not sure how you get an implication that this bond has to be good and true forever if what you've agreed to in writing is, and you can pull it whenever you like. How do we arrive at the implication you want to arrive at? I don't deny that they could pull the bond. I think that the agreement has certain provisions in it, and they say what they say. But once the bond is pulled, there's no consideration. I mean, the GIA no longer has effect. Well, I guess what you're – I don't know. Maybe – I mean, the failure of consideration law is not something that's in the agreement. But this wasn't the bond being pulled. This was an actual default by AMWES in that, for whatever reason, it was in a position where it failed to perform, and the government then was looking to you for a new payment bond. Is that the position?  That is the position. Let me ask you that Perry Rousey rule question that I put to Mr. Bond. This is not something that you argued, and so I find myself sort of like Judge Rendeau is saying, well, maybe I don't understand it because nobody's really arguing. I'm kind of coming up with this thing. Is that not a rule with applicability? Why would you not make that pitch if it was available to you? Your Honor, I have – I agree with you 100%. I believe the rule does apply. This Court has said in the past it applies. I'm not taking a position. I'm just asking questions. No, I'm sorry. I believe it does apply, and this Court has ruled on that exact issue. It would apply if there's a what? There's an ambiguity? I believe it applies in all circumstances. It's not like an insurance contract where it says you have to have ambiguity first before you apply the strict construction against the insurer rule. What the law says, and in Jacobs Constructors v. NPS Energy Services 264 F3rd 365, this Court specifically cited and discussed the Perry Rousey rule in the context of contractual indemnification and said that it follows that enforcement of the duty to indemnify for contractual liability should hinge on the same criteria. So the law is that you must strictly construe the indemnity contract against the party seeking indemnity. Your Honor, I regret that that's not cited in the briefs, and I don't know why it isn't. But if you've got a contract here, GIA, that talks about indemnity without any ambiguity, what's the strict construction against the surety? Well, looking at some of the language of the agreement, the first thing it says is in consideration of the execution and delivery by the surety of a bond or any bonds on behalf of the principal, the statement of consideration. The principle here, I'm sorry, the question is first, who's a surety? Now, the Court has already pointed out surety is a definition. All right. But Swiss Re did not, it's our position, Swiss Re did not deliver a bond. It was a reinsurer for the bonding company. It provided a benefit to Amwes. No, but it's still identified as a surety. Understood, but there's a definition of bonds too. And it did not provide a bond. Bond is any contractual obligation undertaken by surety for principal. Okay, so Amwes delivered both bonds. Amwes delivered the bonds. All right, what difference does it make? Well, Amwes was the party providing consideration. Swiss Re didn't provide any consideration for this agreement. And Amwes is the one that defaulted and the consideration disappeared. Are you saying in the insurance practice that when that occurs because there is reinsurance, which happens every day, that somehow Swiss Re isn't covered as a surety to be benefited specifically under this? I mean, that to me would be kind of alarming to the reinsurers of the world if this is the kind of indemnity they rely on. Especially when capitalist surety is defined as including reinsurers. No, Your Honor, and perhaps I'm not being clear. I apologize. What I'm talking about is strictly what the consideration was for the agreement. Okay. And the consideration is the payment bond and the performance bond provided by Amwes. They were delivered. Not the reinsurance provided to Amwes. So they were delivered. Where does that take you? Where does that lead us? Well, we're back to the question of whether simply delivering the bonds is sufficient. And we believe that delivery implies the continuing obligation of keeping the bonds. I mean, I'm curious that this agreement does not have an addendum by TEC that says, yo, you know, if there's a default under the bonds that are delivered pursuant to this, or if there's a failure to substitute a bond, then that impacts this indemnity. And even if one of the sureties doesn't perform under those bonds, we don't have to pay the reinsurer who otherwise would be entitled to pursue performance under this agreement. I mean, I'm just curious that the four corners of this agreement don't make clear a provision. And I don't think I'm ready to say I read it against the party, you know, who wasn't the party that should have included that language, if you will. Your Honor, I don't believe the agreement includes an integration clause. I don't believe it was intended to be the full terms of the agreement. Obviously, it contemplates the bonds as being additional outside documents. Beyond that, I don't think your statement indicates that the agreement itself is not completely clear as to all possible circumstances arising down the road. Yeah, but if the one who should have added the circumstance, you know, is you, I'm not prepared to, well. The only thing that can really help you is if the agreement does not contain an integration clause, then you must show that there is extant an industry practice or protocol that governs or deals with how insurers, reinsurers, and persons like, or entities like PEC, deal with contracts in this particular arena. And I don't believe that's part of the record in the case at this time, Your Honor. But I understand what you're saying. I mean, I can't speak to what the industry practice and protocol is today. And I don't know that that's in my record. Well, it's not in the record below. Correct, Your Honor. Which leads me to this question. Since it's not in the record below, what would we do if we were to say this is not an either-or? There is a problem here which led to losses. Part of the problem, based on the record, looks like your clients were half done with a job that was due in a week. And part of the problem looks like AmWest went belly up. If there's more than one cause for the problem, are we faced with an either-or? And if we're not faced with an either-or, what ought we to do? What ought the district court to have done? We believe that the court is faced with an either-or and the district court ruled properly. But if the cause becomes an issue, then the case would need to be remanded to determine what the cause was. I don't think that the court made that determination. Well, didn't it, in fact, make the determination when it said it made a ruling as to liability and said the liability here is on Swiss Re, not on you, because AmWest is a failure of consideration? What is that if it's not a statement of cause? The loss here was caused by the insolvency, which was the cause of any loss. I'm not sure how to understand the district court's ruling on liability if it's not a statement as to cause for loss. I believe the court specifically states in the opinion that it doesn't need to make the cause determination because at a minimum the consideration for the GIA failed. And if I'm recalling correctly, I believe the court said something to the effect of it didn't need to reach that issue and make that factual determination. If that's really what the district court meant, then aren't we in exactly the spot that my colleagues have been asking you about where somebody could do a tremendously bad job, have fouled up totally, let's not even say 50%, let's say they're 1% done with the job, and by the fortuity of their surety company running into a problem, they hit the jackpot, they're not on the hook, somebody else is. How could that be contemplated by the parties to start with or sensible public policy? Well, certainly in the 1% situation, I understand that that's what the court does. It makes those determinations. And as a public policy... You have to concede, wouldn't you, that that would be a pretty tough rule to suggest that the commercial world ought to be in play, right? I agree that that's not a rule that the commercial world would want this court to adopt. The flip side of it is, of course, in the reverse situation, where the contractor does nothing wrong or very limited things wrong, yet flip the 99 and the 1% in the other direction. And what does that ruling result in? Maybe it's not an either-or situation, right? It may not be an either-or situation. Our position is that it is and that the failure of consideration in and of itself is enough because that preempts the other determinations as the lower court ruled. I think worst-case scenario for PEC, it is an either-or situation, and the case would then need to be remanded for factual findings regarding the cause of the default. Okay. Thank you very much. Thank you. Rebuttal, Mr. Fong? Just two quick points, if I may. First of all, the question was asked about, or the suggestion was made that Swiss Re did not deliver a bond. A bond is defined by the indemnity agreement as any contractual obligation undertaken by surety. We already know surety includes by definition. Yeah, I don't think you have to deal with that one. And the only other thing, then, is that with respect to a disagree with a counsel, unambiguous indemnity agreements are routinely enforced under Pennsylvania law. Thank you. Thank you. The case is well argued and taken under advisement.